Charles B. CANNON et al., Plaintiffs,

v.

U. S. ACOUSTICS CORPORATION, a Florida Corporation, et al., Defendants.

No. 74 C 662.

United States District Court, N. D. Illinois, E. D.

June 26, 1975.

Boodell, Sears, Sugrue, Giambalvo & Crowley, Chicago, Ill., for plaintiffs.

Baker & McKenzie, Chicago, Ill., for defendants.

## OPINION

MARSHALL, District Judge.

Charles B. Cannon, Richard L. Davis, John G. Marsh, and Jeffrey Ross brought this derivative shareholder's action, as well as personal claims, against the defendants, U.S. Acoustics Corporation (hereinafter "Acoustics"), a Florida corporation, and National Perlite Products, S.A., (hereinafter "Perlite"), a Panamanian Corporation.[1] The six-count complaint alleges violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the common and statutory laws of Florida and Illinois. Jurisdiction of the federal claims exists under 28 U.S.C. § 1331 (1970), and 15 U.S.C. § 78aa (1970). The state claims which arise from the same transactional nucleus as the federal claims are here under the doctrine of pendent jurisdic-

---

1. Perlite is a wholly owned subsidiary of Acoustics.

tion. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Brunswick v. Regent*, 463 F.2d 1205, 1206–1207 (5th Cir. 1972). Jurisdiction of Count 4 of the complaint is based on diversity of citizenship, 28 U.S.C. § 1332(a)(1) (1970).

There are pending for decision cross-motions to disqualify counsel and a motion to disqualify Cannon as a party plaintiff. Shortly after Robert J. Gareis, Peter J. Mone and the firm of Baker & McKenzie filed their appearances on behalf of the corporate and individual defendants, plaintiffs moved to disqualify them from representing the corporate defendants and requested that the court appoint independent counsel.[2] Plaintiffs base their motion on the theory that dual representation in a shareholder derivative suit creates a conflict of interest that the court can order terminated.

Concomitant with filing their answer to the plaintiffs' motion, defendants moved to strike Cannon as a party plaintiff and to strike the appearances of N. A. Giambalvo and Boodell, Sears, Sugrue, Giambalvo & Crowley as counsel for the plaintiff.

Defendants argue that by virtue of Canon 4 of the American Bar Association's Code of Professional Responsibility (hereinafter "CPR"), Cannon (who is a lawyer), and the lawyers and law firm which represent him, cannot maintain the pending suit because each previously represented the corporate defendants in legal matters that are substantially related to the present litigation.

I. *Plaintiffs' motion to strike the appearance of the attorneys on behalf of the corporate defendants*

Plaintiffs' motion to disqualify the lawyers from the firm of Baker &

McKenzie from representing the corporate defendants raises fundamental questions of legal ethics and the extent to which a court should interfere with the right of any litigant to be represented by counsel of his own choosing. Furthermore, a motion to disqualify calls to question not only the probity of the individual lawyer, but the legal profession as a whole. *See Hull v. Celanese Corp.*, 513 F.2d 568 (2d Cir. 1975). Mindful of these problems and considerations we have reached the conclusion that independent counsel must be selected for the defendant corporations.

In substance, the plaintiffs' complaint is a shareholder's derivative suit. While no treatise exposition on the nature of these suits is necessary here, a few pertinent observations will be helpful in analyzing the ultimate issue presented by the motion: whether the same counsel can represent both the individual and corporate defendants in a derivative shareholders suit consistent with the ethical standards promulgated by the American Bar Association and adopted by this court. A derivative suit is, in legal effect, a suit brought by the corporation, but conducted by the shareholders. The corporation, although formally aligned as a defendant for historical reasons,[3] is in actuality a plaintiff. *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1969); *Swanson v. Traer*, 230 F.2d 228 (7th Cir. 1956); 13 W. Fletcher, *Encyclopedia of the Law of Private Corporations*, § 5939, at 324 (1970) (hereinafter "Fletcher"); *see Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 548–49, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The stockholder is only a nominal plaintiff. 13 Fletcher, *supra*, §

2. The motion was filed 16 days after Baker & McKenzie filed their appearance. Therefore the motion was timely. *See Milone v. English*, 113 U.S.App.D.C. 207, 306 F.2d 814 (1962); *Selama-Dindings Plantations, Ltd. v. Durham*, 216 F.Supp. 104 (S.D.Ohio 1963); *Marco v. Dulles*, 169 F.Supp. 622 (S.D.N.Y.), *appeal dismissed*, 268 F.2d 192 (2d Cir. 1959).

3. An extensive historical analysis of shareholder derivative suits is found in *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L. Ed.2d 729 (1970); 2 Hornstein, *Corporate Law and Practice*, § 714, at 198 & n. 44 (1959). *See* Prunty, *The Shareholder's Derivative Suit: Notes on its Derivation*, 32 N.Y.U.L.Rev. 980 (1957).

5941.1, at 328, succinctly states the theoretical basis of the derivative suit:

> [T]he stockholder's suit [has] . . . a double aspect. The stockholders have a right in equity to compel the assertion of a corporate right of action against the directors or other wrongdoers when the corporation wrongfully refuses to sue. The suit is thus an action for specific enforcement of an obligation owed by the corporation to the stockholders to assert its rights of action when the corporation has been put in default by the wrongful refusal of the directors or management to take suitable measures for its protection.

*See Ross v. Bernhard, supra,* 396 at 334, 90 S.Ct. 733. Finally, a derivative action is appropriate to enforce a cause of action under the Securities Act of 1933, and the Securities Exchange Act of 1934. Fletcher, *supra,* § 5925, at 312; *see* Comment, "Shareholder's Derivative Suit to Enforce a Corporate Right of Action Against Directors under SEC Rule 10b–5," 114 *U.Penn.L.Rev.* 578 (1966).

The preceding paragraph delineates the anomalous position of the corporation; it is both a defendant and a plaintiff. An examination of plaintiffs' complaint amply reveals this position. Count 1 alleges that beginning in 1968 and continuing to the present, the individual defendants committed numerous violations of Rule 10b–5:[4] illegal stock options were allegedly granted, stock was issued and purchased upon false representations that the stock was for services, rent, and other expenses, stock was issued for little or no consideration, corporate opportunities were usurped, illegal profits were retained by certain officers and directors, and illegal and excessive compensation was paid to Stedman.[5]

The remaining derivative counts allege the same misconduct but seek recovery under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1970), and the common law of Florida and Illinois.

Even a cursory examination of the foregoing allegations demonstrates that should they be established at trial, Acoustics and Perlite will benefit substantially. For this reason plaintiffs argue that Mone, Gareis, and the firm of Baker & McKenzie cannot represent the alleged wrongdoers and the ultimate beneficiaries of any judgment that might be obtained.

Defendants' position is that although there is a theoretical conflict of interest, no real conflict exists. They argue that the corporations are really inactive participants in the lawsuit,[6] and that should any conflict arise they will withdraw their representation of the individual defendants and continue their representation of the corporations.[7] Defendants further argue that their present position is that all the transactions complained of are legal and should be upheld.

■ The conduct of attorneys practicing before the court is governed by the American Bar Association's CPR. General Rules of the District Court for the Northern District of Illinois, Rule 8(a) & (d).[8] Jurisdiction to enforce the

---

4. Securities Exchange Act of 1934, § 10, 15 U.S.C. § 78j (1970), 17 C.F.R. § 240.10b–5 (1973).

5. This list is not all inclusive. See Complaint, p. 8.

6. *See, e. g., Leven v. Birell,* 92 F.Supp. 436, 444–45 (S.D.N.Y.1949); *Meyers v. Smith,* 190 Minn. 157, 251 N.W. 20 (1933), *noted in* 43 *Yale L.J.* 661 (1934); Washington, "Stockholder's Derivative Suits: The Company's Role and a Suggestion," 25 *Cornell L.Rev.* 361, 362–363 & n. 4 (1940).

7. This understanding was communicated to the individual defendants, and they acquiesced in the arrangement as presented to the court. Defendants' answering memorandum, at 2–3.

8. Other federal courts have adopted the CPR as the ethical standard governing the conduct of attorneys practicing before them. *See, e. g.,* Rule 11, Local Rules of United States District Court for the Eastern District of Pennsylvania, discussed in *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382,

CPR exists by reason of the court's regulatory power over the members of its Bar. *Cord v. Smith*, 338 F.2d 516, 524 (9th Cir. 1964); *Richardson v. Hamilton International Corp.*, 333 F.Supp. 1049, 1052 (E.D.Pa.1971), *aff'd*, 469 F.2d 1382 (1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973); *see United States v. Ott*, 489 F.2d 872, 874 (7th Cir. 1973); *Handelman v. Weiss*, 368 F.Supp. 258, 263 (S. D.N.Y.1972).

When a single lawyer or law firm undertakes to represent both the individual and corporate defendants in a derivative action, at least two potential ethical problems arise. First, there exists, as previously discussed, a potential conflict of interest between the individual and corporate defendants, and second, there is the threat that confidences and secrets obtained from each client may be jeopardized because of the dual nature of the representation. The CPR addresses each of these problems in varying degrees of particularity. No code of ethics could establish unalterable rules governing all possible eventualities. Ultimately, therefore, the resolution of these problems rests in the reasoned discretion of the court.

Canon 5 of the CPR addresses the ethics of representing conflicting interests.[9] It provides that a lawyer "Should Exercise Independent Professional Judgment on Behalf of a Client." Ethical consideration (hereinafter EC) 5–1 sets the Canon's overall objective:

The professional judgment of a lawyer should be exercised solely for the benefit of his client and free from compromising influences and loyalties. . . . [T]he interest of other clients . . . should [not] be permitted to dilute his loyalty to his client.

In the instant case Gareis, Mone and their firm represent two clients with, at a minimum, potentially conflicting interests. The pleadings charge the individual defendants with serious corporate misconduct, and although counsel has in good faith represented there is no present conflict between the two sets of defendants, the subtle influences emanating from the representation of the individual defendants that might lead counsel to reach this position on behalf of the corporations are troubling.

Fortunately there are several other ethical considerations that deal more specifically with multiple clients. EC–18 provides:

A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is con-

1384, & 1386 n. 12 (3d Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973).

9. The CPR is divided into "three separate but interrelated parts: Canons, Ethical Considerations, and Disciplinary Rules." The Canons are axiomatic norms embodying in general terms the standards of professional conduct which the legal system and the public expect from lawyers. From these Canons, the Ethical Considerations and Disciplinary Rules are drawn.

The Ethical Considerations are "objectives toward which every member of the legal profession should strive." Moreover, they provide guidance for many specific situations which may confront a lawyer.

The Disciplinary Rules are mandatory. They are minimum levels of conduct, the violation of which subjects the lawyer to disciplinary proceedings. *CPR*, "Preliminary Statement," February 20, 1970.

vinced that differing interests are not present.

Admittedly the focus of this consideration is on the problem of corporate counsel representing corporate officials when the corporation is not also a party litigant. But its import is clear. The interest of the corporate client is paramount and should not be influenced by any interest of the individual corporate officials.

 Although EC5–18 is persuasive authority for plaintiffs' position, EC5–15 is even more so:

> If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship to the client; and for this reason it is preferable that he refuse the employment initially.

Taken together, these two ethical considerations convincingly establish that in a derivative suit the better course is for the corporation to be represented by independent counsel from the outset, even though counsel believes in good faith that no conflict of interest exists.[10]

The exact question presented by the plaintiffs' motion was considered by the influential Association of the Bar of New York Committee on Professional Ethics, in Opinion 842.[11] The Committee is in full agreement that if the corporation takes an active role in the litigation, independent counsel must be obtained. If the corporation's role is passive, a majority of the committee was still of the opinion that,

> a conflict of interests is inherent in any [derivative] action wherever relief is sought on behalf of the corporation against the individual director-officer defendants, and in such cases Canon 6 [presently Canon 5, EC5–14 n. 6 & 18] precludes one firm from representing both the corporation and the individual director-officer defendants except in unusual circumstances stemming from particular facts in a given case.[12]

In addition to the conflict of interest problem there is also the proscription of Canon 4 that a "Lawyer Should Preserve the Confidences and Secrets of a Client." The question is whether a law firm might jeopardize the confidences or secrets of one defendant while representing the other. In the case of individuals this is a serious problem. In a derivative suit, however, the question is likely to be of less moment since the se-

---

10. EC 5–14 also provides support for plaintiffs' position:

> Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant. [footnotes omitted]

EC 5–16 provides that in some circumstances multiple representation may be permissible if both clients are fully informed of potential conflict and the parties consent to the representation. This consent rationale seems peculiarly inapplicable to a derivative suit, because the corporation must consent through the directors, who, as in the present case, are the individual defendants. *See* Opinion 842, Association of the City of New York Committee on Professional Ethics (Jan. 4, 1960), 15 *Record N.Y.C.B.A.* 80 (1960).

11. *Id.*

12. *Id.*

crets and confidences of the corporate client are probably accessible to the director-officer clients. And while this conflict is less troubling than the conflict of interest difficulties, *see* Comment, "Independent Representation for Corporate Defendants in Derivative Suits," 74 *Yale L.J.* 524, 526–27 (1965); *but see Marco v. Dulles*, 169 F.Supp. 622, 628–30 (S.D.N.Y.), *appeal dismissed*, 268 F.2d 192 (2d Cir. 1959), nevertheless, it is one more reason to examine dual representation with caution.

■ The Canons and Ethical Considerations are aspirational;[13] consequently, they provide only guidance.[14] Thus, while the CPR supports plaintiffs' position, a study of the relevant case law is necessary.[15]

Although there is not a wealth of cases dealing with the problem of dual representation in derivative shareholder's suits, the position of the federal courts has developed along two lines. The older cases have refused to disqualify counsel, while the more recent trend is to require the corporation to obtain independent counsel. This trend has also manifested itself in a number of cases under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501 *et seq.*, (1970).

Defendants' position, which has previously been outlined, is supported by three principal cases. The first of these, *Otis & Company v. Pennsylvania R. Co.*, 57 F.Supp. 680 (E.D.Pa.1944), *aff'd* 155 F.2d 522 (3d Cir. 1946) (per curiam), was a derivative suit alleging that the defendant officers breached their fiduciary duty to the corporation because they failed to "shop around for the best price on a new bond issue." The court concluded that since no fraud was alleged and the bond issue was floated under customary procedure, the corporation could file an answer and ac-

tively defend. The court also refused to remove counsel for the defendant corporation stating:

> [T]here is no reason to require removal of counsel as petitioned. The corporation, as an interested party having a right to appear and defend, may select counsel as it chooses. Moreover, there is no allegation of any breach of confidence or trust of which either the corporations or the individual defendants complain. . . . . Moreover, there are many stockholders' suits on record in which the same counsel represented both the individual and corporate defendants.
> 57 F.Supp. at 684.

*Otis* is still the law of the Third Circuit, *Universal Athletic Sales Co. v. American Gym R. & A. E. Corp., Inc.*, 357 F.Supp. 905, 908–909 (W.D.Pa.1973).

Defendants also rely on *Marco v. Dulles*, 169 F.Supp. 622 (S.D.N.Y.), *appeal dismissed*, 268 F.2d 192 (2d Cir. 1959). *Marco* was a derivative action filed against officers and directors alleging diversion of assets. The original corporate defendant was succeeded in the lawsuit by its successor in interest. The individual defendants were represented in the litigation by the same law firm that had advised the corporation on the transactions that were alleged to be illegal. At no point, however, did the same law firm represent both the individual and corporate defendants in the derivative suit, 169 F.Supp. at 626, 628. Thus the court concluded there was no conflict of interest present.

Although no conflict was found under former Canon 6 (CPR, Canon 5), a more difficult question was presented by the last paragraph of Canon 6, and Canon 37 requiring a lawyer to preserve the confidences of his client even after employment has terminated. Plaintiffs alleged that the continued representation

---

13. *But see* DR 5–105, effective March 1, 1974.

14. The CPR has no statutory force, but is indicative of the legal profession's attitude toward the standards of its members' conduct. *E. F. Hutton v. Brown*, 305 F.Supp. 371, 377 n. 8 (S.D.Tex.1969).

15. Federal law is controlling. *Cord v. Smith*, 338 F.2d 516, 524 (9th Cir. 1964).

of the individual defendants would violate these canons since the firm would be undertaking to represent the directors in matters adversely affecting the present position of the corporation which was that the transaction was illegal. In this context the court indicated, absent the special circumstances of the case, a motion to disqualify could be granted.[16] Furthermore, in dictum, the court added, there might be circumstances in which a former general counsel could represent the directors in a minority suit if the corporate management took the position that the transactions were valid and proper. The court did not, however, say that the corporation and individual defendants could properly be represented by the same firm in a derivative suit. 169 F.Supp. at 630. Consequently, *Marco* only inferentially supports defendants' position.[17]

The last principal case relied on by defendants is *Selama-Dindings Plantations, Ltd. v. Durham,* 216 F.Supp. 104 (S.D.Ohio 1963), *aff'd,* 337 F.2d 949 (6th Cir. 1964) (per curiam), in which the court held without discussion, that it was not improper in a derivative suit for a law firm to represent both the corporate defendant and the individual directors when there was no conflict of interest and no breach of trust. 216 F. Supp. at 115.[18] Although this case supports defendants' position, the court of appeals did not discuss the dual representation issue in its affirmance, and the district court's opinion has never been cited for the proposition suggested by defendants.

The case law referred to by defendants does not represent the present trend in judicial thinking on the ethical propriety of dual representation which has developed in recent derivative shareholder's suits and cases brought under the Labor-Management Reporting and Disclosure Act. 29 U.S.C. § 501 (1970).[19]

The leading lower court decision requiring selection of independent counsel is *Lewis v. Shaffer Stores Co.,* 218 F.Supp. 238 (S.D.N.Y.1963). There, plaintiff stockholder filed a derivative action alleging many of the same transgressions as are pleaded in the present action. One firm entered an appearance and filed an answer on behalf of the directors and the corporate defendant. Plaintiffs filed a timely motion to disqualify the firm from representing the corporation, asking that it be represented by truly independent counsel who would answer the complaint to the end that plaintiffs be invited to prove their case for the benefit of the corporation.

The court held:

The interests of the officer, director, and majority stockholder defendants in this action are clearly adverse, on the face of the complaint, to the interests of the stockholders . . . other than the defendants. I have no doubt that . . . [the law firm] believe[s] in good faith that there is no merit to this action. Plaintiff, of course, vigorously contends to the contrary. The court cannot and should not attempt to pass upon the merits at this stage. Under all the circumstances, including the nature of the charges, and the vigor with which they are apparently being pressed and defended, I believe that it would be wise for the corporation to retain in-

---

16. The court denied the motion to disqualify on several grounds, one of which was that the motion was filed 19 years after the litigation had been instituted.

17. The court does refer to *Otis* by a *cf.* signal. A close reading of the language at 169 F.Supp. 630 nevertheless leads to the conclusion that the court was not sanctioning dual representation as presented in this case, especially when the directors under attack are making the judgment that no conflict exists between them and the defendant corporation.

18. The court did not discuss why there was no conflict of interest. *See* 216 F.Supp. at 111. The court also stated the motion to disqualify was not timely.

19. *See, e. g., Yablonski v. United Mine Workers,* 145 U.S.App.D.C. 252, 448 F.2d 1175, 1181 (1971).

dependent counsel, who have no previous connection with the corporation, to advise it as to the position it should take in this controversy. See *Garlen v. Green Mansions, Inc.,* 9 A.D.2d 760, 193 N.Y.S.2d 116 (1st Dept.1959), *Marco v. Dulles, supra.* 218 F.Supp. at 239–40.

The *Lewis* approach is the most advisable. On the face of plaintiffs' complaint there is a conflict of interest.[20] It is unwise to assess the merits of the case now. See *Smith v. Sperling,* 354 U.S. 91, 95, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); Comment, "Independent Representation for Corporate Defendants in Derivative Suits," 74 *Yale L.J.,* 524, 525 (1965).[21] The merits of the case and the appropriate role for the corporate defendants to take in the litigation should be decided after independent counsel has investigated the facts and circumstances surrounding the allegations of the complaint. 218 F.Supp. at 240.

A result similar to *Lewis* was reached in *Murphy v. Washington American League Base Ball Club, Inc.,* 116 U.S. App.D.C. 362, 324 F.2d 394 (1963). Plaintiff brought a shareholder's derivative suit to challenge certain salary increases voted by the board of directors substantially for their own benefit. The corporation, a nominal defendant in the suit, was represented by the same firm that represented the individual officer-director defendants. The court held that dual representation was not proper because if the charges had substance, counsel chosen to represent both the

wrongdoer and beneficiary of any judgment would not be able to guide the litigation in the best interest of the corporation. See *Essential Enterprises Corporation v. Dorsey Corporation,* 40 Del. Ch. 343, 182 A.2d 647 (1967); *Garlen v. Green Mansions, Inc.,* 9 A.D.2d 760, 193 N.Y.S.2d 116 (1959) (per curiam). See generally *United States v. Spencer,* 473 F.2d 1009 (2d Cir. 1973).

The emerging judicial condemnation of dual representation in shareholder derivative suits is also evident in suits under Section 501 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501 (1960).[22] Under this section a hybrid derivative action is allowed. Union members may sue the union and its officers for breach of fiduciary duty (§ 501(a)) and any recovery belongs to the union. See *Yablonski v. United Mine Workers,* 145 U.S.App.D.C. 252, 448 F.2d 1175, 1181 (1971); *International Brotherhood of Teamsters v. Hoffa,* 242 F.Supp. 246 (D.D.C.1965). These cases require that independent counsel be appointed when there is a potential conflict between the interests of the union and accused officers. *Weaver v. United Mine Workers,* 160 U.S.App. D.C. 314, 492 F.2d 580, 583 (1973); *Yablonski v. United Mine Workers,* 145 U. S.App.D.C. 252, 448 F.2d 1175 (1971), *petition for enforcement granted, Yablonski v. United Mine Workers,* 147 U.S.App.D.C. 193, 454 F.2d 1036 (1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972); *Tucker v. Shaw,* 378 F.2d 304, 307 (2d Cir. 1967); *Milone v. English,* 113 U.S.App.D.C. 207, 306 F.2d 814 (1962).[23]

---

20. The court did not consider the conclusory affidavit of Charles G. Cannon, submitted April 19, 1974.

21. A parallel can be drawn to a motion to dismiss under *Fed.R.Civ.P.* 12(b). In a ,shareholder's derivative suit a conflict should be presumed unless under no set of facts could the plaintiff establish conflict of interest. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S. Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Holiday Magic Inc. v. Warren,* 497 F.2d 687, 694 (7th Cir. 1974).

22. In addition to the ethical difficulties inherent in dual representation, the courts, in labor cases, have considered the congressional goals behind § 501. *Yablonski v. United Mine Workers,* 147 U.S.App.D.C. 193, 454 F.2d 1036, 1038 n. 8, 1039 & n. 21 (1971); *cert. denied,* 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972).

23. The *Milone* rationale was held equally applicable to shareholder's derivative suits. *Murphy v. Washington American League Base Ball Club, Inc.,* 116 U.S.App.D.C. 362, 324 F.2d 394, 398 (1963).

In summary, this is a derivative shareholder action against four officer-directors and two corporations. The complaint alleges that certain directors misappropriated monies of the corporation and violated federal and state securities laws. These are serious charges. If they are proved, the corporations stand to gain substantially. The CPR unquestionably prohibits one lawyer from representing multiple clients when their interests are in conflict. The code goes so far as to say that if the clients' interests are potentially differing, the preferable course is for the lawyer to refuse the employment initially. In addition, at least one influential bar association has issued an opinion stating that dual representation is subject to conflicts of interest even when the corporation takes a passive role in the litigation. The case law on the question is not consistent; older cases hold dual representation is not improper, while more recent decisions hold that it is, both in derivative shareholder suits and in suits under 29 U.S.C. § 501 (1970).

As previously discussed the court is bound to apply the CPR to lawyers practicing before it. The code is clear that multiple representation is improper when the client's interests are adverse. Nevertheless, defendants' counsel argue there is no present conflict and should one arise they will withdraw their representation of the individual defendants and represent only the corporations. There are a number of problems with this solution. First, the complaint on its face establishes a conflict that cannot be ignored despite counsel's good faith representations. Second, counsel overlooks the hardship on the court and the parties if in the middle of this litigation new counsel must be obtained because a conflict arises. Lastly, although counsel offers to withdraw its representation of the individual defendants and remain counsel for the corporations if a conflict should arise, the appropriate course, as suggested by *Lewis* and *Murphy,* is for the cor-

poration to retain independent counsel. Under this procedure, once counsel has examined the evidence, a decision can be made regarding the role the corporation will play in the litigation. This decision will be made without the possibility of any influence emanating from the representation of the individual defendants, and will also eliminate the potential problem of confidences and secrets reposed by the individual defendants being used adverse to their interests by former counsel should new counsel have had to have been selected under the approach suggested by defense counsel. This solution, concededly, is not without its disabilities. The corporations' rights to counsel of their choice are infringed and in a closely held corporation, as here, the financial burden is increased. Nevertheless, on balance, the corporations must obtain independent counsel. 13 Fletcher, *supra,* § 6025, at 528; Osborn, "Developments in Corporate Law," 14 *Bus.Law.* 577, 578 (1964); Comment, "Independent Representation for Corporate Defendants in Derivative Suits," 74 *Yale L.J.,* 524 (1965).

Two questions remain. The first is how new counsel should be selected. Plaintiffs urge the court to make the selection because the individual defendants still serve as the board of directors and thus will make the selection unless prevented from doing so. There is no precedent in the reported decisions to support plaintiffs' suggestion. In *Lewis,* the court specifically held the problem of selecting counsel was not insurmountable and allowed the board to select new counsel. 218 F. Supp. at 240.

The defendant corporations may select their own counsel. Certainly new counsel will recognize their duty to represent solely the interests of the corporate entities. And should difficulties arise, the parties or counsel may apply to the court for additional relief.

The final question is whether the corporations' answer should be stricken and new pleadings filed. Al-

though this relief was not specifically requested, it is implied in the motion to strike the appearance of the corporations' counsel. *See Lewis v. Shaffer Stores Company,* 218 F.Supp. 238, 240 (S.D.N.Y.1963); *Teamsters v. Hoffa,* 242 F.Supp. 246, 257 (D.D.C.1965). The answer filed on behalf of the corporate defendants will be stricken with leave to new counsel to refile within 20 days of this order.

In accord with the foregoing, plaintiffs' motion to strike the appearance of Gareis, Mone and the firm of Baker & McKenzie as counsel for defendants Acoustics and Perlite, is granted, and the answer of these defendants is stricken with leave to new counsel to answer anew within 20 days.

II. *Defendant's motion to strike the appearance of plaintiffs' attorneys and to disqualify Charles B. Cannon as a plaintiff.*

Shortly after plaintiffs filed their motion to disqualify Messrs. Gareis and Mone and Baker & McKenzie, defendants filed their motion to strike the appearance of N. A. Giambalvo and Boodell, Sears, Sugrue, Giambalvo & Crowley as attorneys for plaintiffs and to disqualify Charles B. Cannon as a plaintiff. In substance, both motions are similar. Defendants allege that Cannon and Giambalvo represented defendants in prior matters that are substantially related to the issues in the present suit and therefore cannot, consistent with the CPR, prosecute or be a party to this litigation. Cannon and Giambalvo argue that although they have represented de-

fendants in various matters in the past, that representation is not substantially related to the issues raised in the present litigation. Because the motion is grounded on separate instances of representation, the exact nature of Cannon's and Giambalvo's legal services must be examined. Before moving to the facts, however, a statement of the applicable principles of law is necessary.

When an attorney undertakes litigation against a former client, the attorney may be disqualified if the new representation violates an ethical duty to the former client. The common law fashioned the law of disqualification to assure the public that any information disclosed to an attorney in a professional capacity would never be disclosed or utilized adversely without the consent of the client. The rule was designed to encourage individuals to divulge freely to their attorneys all the information necessary to prepare adequately the client's case. Note, "Disqualification of Attorneys for Representing Interests Adverse to their Former Clients," 64 *Yale L.J.* 917, 918–921 (1955), *noting Consolidated Theaters, Inc., v. Warner Bros. Circuit Management Corp.,* 216 F. 2d 920 (2d Cir. 1954).

The common law principles of disqualification are embodied in the CPR. Canon 4 [24] provides: "A Lawyer Should Preserve the Confidences and Secrets of a Client." The parameters of Canon 4 are set out in the accompanying ethical considerations. EC 4–1 stresses the importance of the Canon in seeing that there is full disclosure by the client.

24. Canon 4 of the CPR is the present embodiment of former ABA Canons 6 and 37.
6. *Adverse Influences and Conflicting Interests*

. . . The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers and employment from others in matters adversely affecting the interest of the client with respect to which a confidence has been reposed.
37. *Confidences of a Client*

It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyers employment and extends as well to his employees; and neither of them should accept employment which involves disclosure or use of these confidences, either for private advantage of the lawyer or his employees or to the disadvantage of the client without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or new client.

Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance.

The ethical obligation under Canon 4 is broader than the evidentiary privilege. This fact is clearly stated in EC 4–4.[25]

The attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidences and secrets of his client. This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge. . . .

For the purpose of the present motions, EC 4–5 is extremely important because it bars a lawyer from using information gained in the course of a representation to the disadvantage of the client.

A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes. . . . Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another,[7] and no employment should be accepted that might require such disclosure.[26]

 The admonition of Canon 4 and the accompanying Ethical Considerations is clear: a lawyer may not use the confidences and secrets of a client to the client's disadvantage or to the lawyer's advantage. And Canon 9 stresses that "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." This axiom may, in some instances, require a lawyer to decline otherwise ethical representation of a client if the representation would appear to be improper and thus tend to diminish public confidence in the legal system. ABA Standing Committee on Professional Ethics, Informal Opinion No. 885 (Nov. 2, 1965). See EC 9–1, 9–2.

██ Obviously the prohibitions of Canons 4 and 9 do not apply in every instance in which a lawyer undertakes a case adverse to the interests of a former client. See, e. g., United States v. Standard Oil Company, 136 F.Supp. 345 (S.D.N.Y.1955). For example, if the matters in the present representation are totally unrelated to the former representation, no ethical problem exists. But mere remoteness of a conflict is not

---

25. DR 4–101(A) defines confidence as referring to information protected by the attorney-client privilege and secret refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

26. Footnote 7 states in part:
[A]n attorney must not accept professional employment against a client or a former client which will, or even *may* require him to use confidential information obtained by the attorney in the course of his professional relations with such client regarding the subject matter of the employment. . . . *ABA Opinion* 165 (1936).

always determinative. H. Drinker, *Legal Ethics,* 108 (1963). The issue then is the relationship of the two representations and the possibility that secrets and confidences reposed by the former client might be used against his interest.

The seminal decision on this issue is *T. C. Theatre Corporation v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953). In that case defendants, two movie companies, moved to disqualify several of the plaintiffs' attorneys in a private antitrust action. Plaintiffs' lead attorney had previously represented defendants in an almost identical action brought by the Government. Simply stated, defendants argued that the attorney was attempting to prove against them the very charges he previously had defended.

Holding that the attorney must be disqualified under the predecessor to Canon 4, the court rejected plaintiffs' contention that defendants were required to show that during the previous litigation they had disclosed matters to the attorney related to the instant case. On the contrary,

. . . the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or course of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained. . . . In cases of this sort the Court must ask whether it can

reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject matter of his subsequent representation. If so, then the relationship between the two matters is sufficiently close to bring the latter representation within the prohibition of Canon 6 [CPR Canon 4]. 113 F.Supp. at 269.

In essence the court was saying it would order disqualification if the matters in the two engagements were substantially related. This is determined by asking whether it could reasonably be said that during the former representation the attorney might have acquired information related to the subject matter of the subsequent representation. Importantly, the court did not require the movant to prove that confidences and secrets were reposed. That fact is assumed once a substantial relationship is established. *See also Hull v. Celanese Corp.,* 513 F.2d 568 (2d Cir. 1975).

The principles applied in *T. C. Theatre* were approved and explained in *Consolidated Theaters, Inc. v. Warner Bros. Circuit Management Corps.,* 216 F.2d 920 (2d Cir. 1954).[27] There the court noted that the substantial relationship test is not a rule of substantive law but a measure of the quantum of evidence required for proof of the allegation. 216 F.2d at 924. And furthermore, the assertion that adverse information had not yet been used and would not be used did not obscure the attorney's obligation to refuse the proffered employment. *Id.* at 925.

The scope of the substantial relationship test was further defined in *Fleischer v. A.A.P., Inc.,* 163 F.Supp. 548 (S.D.N.Y.1958), *appeal dismissed,* 264 F.2d 515 (2d Cir. 1959), *cert. denied,* 359 U.S. 1002, 85 S.Ct. 68, 3 L.Ed. 2d 1030 (1959). In denying a motion to

27. *See also Harmar Drive-in Theater v. Warner Bros. Pictures,* 239 F.2d 555 (2d Cir. 1956); *Laskey Bros. v. Warner Bros. Pictures,* 224 F.2d 824 (1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956).

disqualify because no substantial, relationship was shown, the court held,

> [o]nly when it is clearly discernible that the issues involved in a current case do not relate to matters in which the attorney formerly represented the adverse party will the attorney's present representation be treated as measuring up to the standards of legal ethics. 163 F.Supp. 553.

And as a necessary corollary to this statement the court added that although the burden of establishing the substantial relationship is on the party seeking to disqualify the opposing attorney, a close case should be resolved in the movant's favor. *Id.* at 553; *United States v. Standard Oil Company*, 136 F.Supp. 345, 364 (S.D.N.Y.1955). This position is entirely consistent with the previously discussed aim of Canon 9 to avoid the appearance of impropriety.

The most recent application of the principles behind Canon 4 is furnished by *Emile Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973).

> Canon 4 implicitly incorporates the admonition, embodied in old Canon 6, that "The [lawyer's] obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed." Without strict enforcement of such high ethical standards, a client would hardly be inclined to discuss his problems freely and in depth with his lawyer, for he would justifiably fear that information he reveals to his lawyer on one day may be used against him on the next. A lawyer's good faith, although essential in all his professional activity, is, nevertheless, an inadequate safeguard when standing alone. Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might bend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event would the litigant's or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage. 478 F.2d at 570–71.

█ Moreover, the court held that it could not inquire whether confidences were in fact reposed, for such an inquiry would require the disclosure of the very confidences sought to be protected. Therefore, if it can reasonably be found that the attorney might have acquired information in the former representation that is related to the subject matter of the subsequent representation, the attorney must be disqualified.[28]

Application of the foregoing principles to the facts of the present litigation

---

28. In *United States v. Standard Oil Company*, 136 F.Supp. 345, 354 & n. 11 (S.D.N.Y. 1955), the court held that mere access to material in the former representation which is substantially related to the subsequent representation is sufficient to raise the inevitable inference that confidences were reposed.

The *Emile* principle was applied in *Hull v. Celanese Corp.*, 375 F.Supp. 922 (S.D.N.Y. 1974), *aff'd*, 513 F.2d 568 (2d Cir. 1975), and *Motor Mart, Inc. v. Saab Motors, Inc.*, 359 F.Supp. 156 (S.D.N.Y.1973).

is not an easy task, and the problem is complicated by the absence of decisions discussing these principles when a substantial relationship is not clearly apparent.[29] In the instant case the parties have submitted affidavits, billing records, correspondence, corporate minutes, and the pleadings to support their positions, all of which were examined and considered.

Before moving to the facts surrounding the prior representation of defendants by Giambalvo, a brief description of the corporate and individual defendants is necessary. Acoustics is a Florida corporation, and Perlite, a wholly owned subsidiary of Acoustics, is a Panamanian corporation organized in 1970. The individual defendants are the "dominant and controlling stockholders, directors and officers" of the two corporations.[30] R. K. Stedman is presently the chairman of the board of Acoustics and Perlite.[31] The sole business of the corporations during the periods in question was the patenting and licensing of building products and related areas.[32]

Giambalvo's relationship with defendants was not protracted. In 1970, while a partner in the firm of Boodell, Sears, Sugrue, Giambalvo & Crowley, he performed legal services for Acoustics, the exact nature of which is in dispute. In their memorandum in support of their motion, defendants assert that Giambalvo acted as legal counsel for Acoustics in July and August of 1970. Giambalvo prepared a pre-organization subscription agreement for "Perlite International

Products," a Swiss corporation. For reasons that are not disclosed, the Swiss corporation was never formed. Instead, Perlite was incorporated in Panama, and for the purpose of this motion, the incorporation was done on substantially the same terms as Giambalvo set out in the Swiss pre-organization agreement.[33] For his services, Giambalvo issued a statement dated August 24, 1970, for $684.39.[34]

Defendants argue that in the course of preparing the agreement Giambalvo received confidential communications which are substantially related to the present litigation. To establish their contention, defendants refer to a number of exhibits. They first point to Giambalvo's statement which itemizes professional services in connection with the pre-organization agreement including conferences, telephone conversations, and correspondence with Stedman, Cannon and Davis.[35] The nature of these communications is explained in Stedman's affidavit. He states that Giambalvo gave legal advice to Acoustics and the individual defendants "regarding, among other things, the pre-organization subscription agreement" for Perlite.[36] No explanation of "among other things" is offered. Finally, Stedman claims that Giambalvo received, in connection with the pre-organization agreement, confidential information concerning the internal affairs of the defendant corporations, including finances, taxes, stock, and other areas of internal management.[37] Most importantly, defendants assert that Giambalvo drafted paragraph

---

29. *But see, Fleischer v. A.A.P., Inc.*, 163 F. Supp. 548 (S.D.N.Y.1958), *appeal dismissed*, 264 F.2d 515 (2d Cir. 1959), *cert. denied*, 359 U.S. 1002, 85 S.Ct. 68, 3 L.Ed.2d 1030 (1959) ; *United States v. Standard Oil Company*, 136 F.Supp. 345 (S.D.N.Y.1955).

30. Complaint, ¶¶ 2–4.

31. Affidavit of R. Kimbell Stedman, ¶ 2, June 26, 1974.

32. *Id.* at ¶ 8.

33. *Compare* Defendants' Exhibit "C" *with* Plaintiffs' Exhibits "C" & "J". Close scru-

tiny of these documents reveals that the percentage of shares to be issued to the incorporators is identical under both agreements, although the times for issuance do vary. *See also* Defendants' Exhibit "D".

34. Plaintiffs' Exhibit "F-2".

35. Defendants' Exhibit "B", filed May 6, 1974.

36. *Affidavit of R. K. Stedman*, ¶ 15.

37. *Id.* at ¶ 19 ; Exhibit "D".

5(e) of the subscription agreement which authorizes a number of shares to be issued to Stedman in consideration for services rendered. And since the complaint alleges in paragraph 8(b) that stock was issued to Stedman for services never rendered, there is a substantial relationship between the former representation and the present litigation.

In response to these allegations, Giambalvo filed a lengthy affidavit with supporting exhibits that clarifies his former representation. The affidavit describes that on June 15, 1970, Acoustics requested he advise it on the legal requirements and costs attendant to the organization of a Swiss corporation. These requirements were communicated to Stedman on July 1, 1970,[38] together with a statement for a deposit to cover all costs.[39] On July 13, 1970, he prepared the subscription agreement and forwarded it to Stedman.[40] No further legal services were performed after this date, and Giambalvo terminated his representation of Acoustics on August 21, 1970.[41] A final statement for fees was mailed on August 27, 1970.

Giambalvo asserts that he never received any confidential data or information regarding the business affairs of Acoustics. The only written communication was a letter dated July 8, 1970, in which Stedman suggested the capital structure of Perlite.[42] Thus, Stedman apparently formulated the capital structure which was incorporated in the stock for services provision of paragraph 5(e) of the subscription agreement. Similarly, Giambalvo asserts that the oral communications were limited to the corporate purposes and capital structure of Perlite.[43] Finally, Giambalvo states he never received, in the course of his representation any "data or information concerning U.S. Acoustics Corporation relative to its (i) financial affairs, statements, or reports, (ii) its taxes or accounts, (iii) its corporate minute books, (iv) its stock record books, (v) its banking records or any other data or information concerning the internal business and affairs of U.S. Acoustics, its officers, its directors, and its shareholders."[44]

█ Applying these facts to the principles embodied in the CPR and the applicable decisions, the motion to disqualify Giambalvo is denied. As movants defendants had the burden of establishing that during the former representation Giambalvo rendered professional services on matters that are substantially related to the matters embraced in the pending suit. This they have not done. Although Giambalvo worked on a subscription agreement for Acoustics, the only matter in that agreement that arguably is substantially related is the stock for services provision of paragraph 5(e). And the relevant portions of that paragraph were apparently provided by Stedman in his July 8, 1970 letter. Furthermore, Giambalvo never represented Perlite or the individual defendants in any matters.

Applying the *T.C. Theatre* test, it cannot reasonably be said that in the course of the former representation Giambalvo might have acquired information related to the present litigation. *See generally Shelley v. The Maccabees*, 184 F.Supp. 797 (E.D.N.Y.1960). Therefore, defendants' motion to disqualify N. A. Giambalvo and the firm of Boodell, Sears, Sugrue, Giambalvo & Crowley is denied.

█ Although the record does not justify the disqualification of plaintiffs'

---

38. Affidavit of R. K. Stedman, ¶¶ 2–3, Exhibit "A".

39. *Id.,* at ¶ 3; *Id.* at Exhibit "B".

40. *Id.,* at ¶ 4; *id.* at Exhibits "C" and "D".

41. *Id.,* at ¶ 8; *id.* at Exhibit "F".

42. *Id.* at ¶ 13; *id.* at Exhibit "I".

43. *Id.* at ¶ 15.

44. *Id.* at ¶ 14. In a letter dated Jan. 26, 1970, Giambalvo did provide Cannon with a legal opinion regarding an action agreement. There is no evidence that this letter or the subject matter thereof, is in any way substantially related to the present litigation. Exhibit "K".

counsel either for impropriety or the appearance thereof, Cannon, who is a lawyer, must be disqualified as a party plaintiff.

In support of their motion to disqualify Cannon, defendants have submitted documentary evidence which is so voluminous that it compels the conclusion that Cannon must have acquired information in the past representation of the corporations and their officers that he now seeks to use to his advantage and to their detriment. Stedman's affidavit reveals that Cannon performed a multitude of legal matters for the two corporations and the individual defendants acting on their behalf, during the years 1961–1973. While it is not feasible to set out all the details of his past representation, a few examples are illuminating. From 1968 to 1972, Cannon was the sole legal counsel for Acoustics, and from 1970 to 1973, he was the sole legal counsel for Perlite.[45] Importantly, this is the same period in which wrongs against the corporations allegedly occurred. This and prior representation going back to 1961 is evidenced by defendants' group Exhibit "A", a stack of billing statements. They reveal that on numerous occasions Cannon had personal conferences and gave advice on the affairs of the corporations to Stedman and other defendants. From 1968–1973, all contracts and agreements relating to the internal and external affairs of the two corporations were prepared by Cannon;[46] the complaint requests that many of these agreements be rescinded.[47] In addition, all material mailed (as well as drafts thereof) to stockholders was reviewed by Cannon, prepared by his secretary, and mailed from his office.[48] Cannon also had possession from 1969–

1973, of all the stock books and the corporate seal of Acoustics.

In addition to the general matters previously referred to, Stedman's affidavit sets out several specific examples of the conflict presented by Cannon's present status. The complaint alleges that Stedman received exorbitant sums from certain licensees. At least one of these sums was paid under a contract negotiated and prepared by Cannon.[49] In 1972 and 1973, Cannon initiated discussion with American Cyanamid Corporation on the possibility and advisability of the sale of Acoustics and Perlite to Cyanamid.[50] These two examples show not only a conflict between past and present representation, but also that Cannon must have had access to information and materials which could be used adversely against his former clients.

Cannon strenuously resists the effort to disqualify him as a plaintiff. He first argues that many of his services did not constitute the practice of law since they concerned only the application and prosecution of patent applications. *Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792, 794 (D.Del. 1954). Plaintiffs have not delineated how much of the services rendered over the 12 years from 1961–1973, were not the practice of law. Moreover, Cannon's billings and communications to defendants[51] and others, reveal he did not act "exclusively with technical engineering aspects of patent procurement or with any other matters which may as easily be handled by a layman." *Channel Master Corp. v. RMS Electronics, Inc.*, 159 U.S.P.Q. 344, 345 (S.D.N.Y. 1965). Finally, the language of these cases deals only with the attorney-client

---

45. Affidavit of R. K. Stedman, ¶¶ 6 & 7.

46. *Id.* at ¶ 15.

47. *Complaint*, at 13, ¶ D. *See also id.* at 6, ¶ 8(m).

48. *Id.* at ¶ 4.

49. Affidavit of R. K. Stedman, ¶¶ 15–16, and Exhibits A–B, referred to in the above paragraphs.

50. *Id.* at ¶ 22, and exhibit referred to therein.

51. *See e. g.*, Defendant's Exhibit "D", ¶ 1(a).

privilege. As previously noted, the CPR also covers secrets. Cannon was acting as legal counsel for defendants, during which he must have been privy to his clients' secrets and confidences.

Cannon next argues that even if he was acting as legal counsel for defendants, the scope of his representation was not substantially related to the matters raised in the pending suit; his past representation was limited solely to patent and trade secret matters while the issues in the derivative action are in no way related to these subjects.

There are several inherent flaws in this argument. The first is that the sole business of the corporations was and is the patenting and licensing of building products. And during the period in question Cannon was the sole legal counsel for the corporations. Furthermore, he does not dispute that he drafted documents, including licensing agreements, gave legal opinions, and reviewed all material that was mailed to the shareholders, including financial statements and proxy materials.

Cannon also argues that all his work related solely to external matters. He does not, however, suggest how the external and internal matters of a corporation can be separated. Moreover, denominating matters as external does not alter the possibility that confidences and secrets reposed in regard to those matters are related to the issues in the pending litigation.

 Although the previously discussed case law related to disqualifying attorneys, the same rules and canons apply to counsel turned litigant. In the leading case of *Richardson v. Hamilton International Corp.*, 469 F.2d 1382 (3d Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973), the court affirmed a district court order (333 F.Supp. 1049 (E.D.Pa.1971)) disqualifying a plaintiff from maintaining a derivative shareholder's suit and class action against Alexander Hamilton Life Insurance Company of America, its directors, officers and parent corporation. The complaint alleged various securities violations in connection with a merger of the parent and subsidiary. Reviewing the record, the court found that the plaintiff, while an associate with the firm retained to represent Hamilton, spent a considerable time interviewing defendants and examining their personal files, as well as the files of Hamilton.

> Although the exact nature of the information received is unknown, it is known that he had access to confidential information about Hamilton Life's finances, corporate structure and operations, which he would not have received had he not been its attorney. 469 F.2d at 1385.

In affirming the district court order, the court also observed that direct evidence that the previous representation is related to the present suit is not needed. Citing *T.C. Theatre* the court held that defendants need only show Richardson might have acquired substantially related information. 469 F.2d at 1385.[52]

In the instant case the record requires that Cannon be disqualified as a plaintiff. He represented defendants for 12 years, five of which he was their sole counsel. There is no question that in the course of that former representation he might have acquired information which is substantially related to the pending suit. And even if defendants had been unable to persuade the court that there was a substantial relation-

---

52. *See Doe v. A. Corp.*, 330 F.Supp. 1352, 1355 (S.D.N.Y.1971), *aff'd sub nom., Hall v. A. Corp.*, 453 F.2d 1375 (2d Cir. 1972) (Mem.); wherein the court held in a similar case, "[t]he test under the canon [4] is whether in this litigation Doe would be required to do anything which might injuriously affect his former clients in any matter in which he formerly represented them, or whether he would be called upon to use against these former clients any knowledge or information acquired through his former connection with them. Drinker, *Legal Ethics* 105 (1952)."

ship, Cannon's representation was so lengthy and pervasive that he would have to be disqualified under Canon 9.

Defendants' motion to disqualify Charles B. Cannon in this cause, and to enjoin him from disclosing any information received from the individual and corporate defendants during the course of his representation of defendants is granted and Charles B. Cannon is dismissed as a party plaintiff.