**Stanley L. HANDELMAN et al.,**
**Plaintiffs,**

v.

**Martin D. WEISS et al., Defendants.**

**No. 73 Civ. 2872 HRT.**

United States District Court,
S. D. New York.

Nov. 8, 1973.

Rosen, Wise, Felzen & Salomon, by Chester B. Salomon, New York City, for plaintiffs.

Delson & Gordon, by Evan L. Gordon, New York City, for defendant Martin D. Weiss.

Saiber, Schlesinger & Satz, by Gerald P. Seid, Newark, N. J., for defendant Harlan J. Sauer.

## OPINION

TYLER, District Judge.

The underlying action in this case has been brought by plaintiffs to recover for defendants' alleged violations of the antifraud provisions of the federal securities laws. More specifically, plaintiffs claim that they have been induced to purchase securities from JNT Investors, Inc. ("JNT") by reason of defendants' deceptive or negligent practices.

Plaintiffs are Stanley L. Handelman, Allan Handelman and Mary Handelman, customers of JNT. Defendant Loeb, Rhoades & Company ("Loeb, Rhoades"), is a co-partnership engaged in the general brokerage and commission business, and a broker-dealer in securities. Defendant Martin D. Weiss, was an employee of Loeb, Rhoades, and served as a registered representative to the accounts of plaintiffs at Loeb, Rhoades. Defendant Jay N. Tabatchnick was a principal shareholder, director and president of JNT. (Tabatchnick has not yet been served.) Defendant Harlan J. Sauer, the Senior Vice President and Secretary of JNT, was also a shareholder and director of JNT.

Sauer has moved pursuant to 28 U.S. C. § 1406(a) to have this action dismissed or transferred due to lack of proper venue. Alternatively, Sauer seeks to be severed from this action. Weiss has joined with Sauer in seeking to have this case transferred to the District of New Jersey for the convenience of the parties, 28 U.S.C. § 1404(a). Weiss and Sauer have also petitioned to

have the law firm of Rosen, Wise, Felzen & Salomon, Esqs., disqualified from representing plaintiffs in this action and from having any connection with this litigation. For the reasons hereinafter discussed, the motions for dismissal, severance and transfer are denied, while the motion for disqualification is granted.

■ Defendants' motions concerning venue and severance are easily disposed of. Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and § 22 of the Securities Act of 1933 (15 U.S.C. § 77v), provide, in effect, that suit may be brought in any United States District Court wherein any of the acts complained of took place or where the defendant is found, is an inhabitant, or transacts business. Defendants have not disputed the fact that many of the key events took place in the Southern District of New York. It is clear, therefore, that this court has the power to hear this case. See e. g. Reich v. Butcher, 338 F.Supp. 438 (E.D.Pa. 1972). Since venue is not improper, this court has no authority under 28 U.S.C. § 1406(a) to transfer the case.

■■ Defendants seek to have this case transferred to New Jersey on the basis that most of the parties to the action reside there and that since the parties will be witnesses, New Jersey will therefore be a more convenient forum. In order to disturb plaintiffs' choice of forum, however, the defendants must show that the District of New Jersey is substantially more convenient. Gulf Oil Corporation v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); City of New York v. General Motors Corporation, 357 F.Supp. 327 (S.D.N.Y. 1973). There are no compelling reasons to transfer this case. Defendants Weiss and Sauer live within easy commuting range of New York City, and most of the acts in question occurred in this district. Moreover, because the related JNT liquidation proceeding is before it, this court has some familiarity with the background of this suit. Many, if not all, important records of JNT are also located in this district.

Defendants' motions brought under 28 U.S.C. §§ 1406(a) and 1404(a) to dismiss, sever, or transfer are therefore denied.

■ In order to fairly consider defendants' motion to disqualify plaintiffs' law firm, it is necessary to understand a bit of the background to this proceeding. On February 15, 1972, the Securities and Exchange Commission ("SEC") commenced an action against JNT for violations of the bookkeeping and net capital provisions of the Securities Exchange Act of 1934 and the rules promulgated thereunder. 15 U.S.C. § 78o(c)(3) and Rule 17 CFR 240.15c3–1. Pursuant to § 5(a)(2) of the Securities Investors Protection Act of 1970 ("SIPA"), 15 U.S.C. § 78eee(a)(2), the Securities Investor Protection Corporation ("SIPC") joined this action and, in accordance with § 5(b)(1) of the Act (15 U.S.C. § 78eee(b)(1)), applied for a decree adjudicating that the customers of JNT were in need of protection. As required by statute, 15 U.S.C. § 78eee(b)(3), SIPC also requested an order appointing Jerry B. Klein of Herz, Herson & Company, trustee, and Harvey R. Miller of Weil, Gotschal & Manges attorney for the trustee. The application was granted and JNT is currently being liquidated under the supervision of this court in accordance with the procedures of SIPA (15 U.S.C. § 78eee(b)(3)).

Under § 6(a) of SIPA (15 U.S.C. § 78fff(a)), a SIPC trustee has a duty to return to the customers of the debtor (JNT) "specifically identifiable property",[1] to distribute the "single and separate fund," [2] and pay to customers

---

1. This property may include both cash and securities. To be "specifically identifiable", however, the property must remain in its identical form in the debtor's possession or be allocated to or physically set aside to customers on the filing date. 15 U.S.C. § 78fff(c)(2)(C).

2. The "single and separate fund" includes all property of security customers except that

monies advanced by SIPC. The trustee is also required to complete open contractual commitments of the debtor, to enforce rights of subrogation,[3] and to liquidate the business of the debtor. While the duties of the attorney for the trustee are not specifically spelled out in SIPA, it seems clear that it is his obligation to assist the trustee in the performance of his tasks.

Chester B. Salomon, who was then an associate of Weil, Gotschal & Manges, acted as one of Harvey R. Miller's assistants in the matter of the JNT liquidation. Salomon continued to work on the JNT liquidation until February 13, 1973, when he left Weil, Gotschal & Manges to form his own law firm. It is this newly formed law firm which commenced the present action on June 20, 1973.

As assistant to Miller, Salomon has stated that he aided the trustee in collecting assets, reducing them to money and distributing the customer accounts. He also prepared applications to this court for orders authorizing the trustee to distribute cash and securities to the customers of JNT who were entitled thereto. At the May 26, 1972 hearing of one of these applications, questions were raised by the SEC concerning some of the customers. On June 9, 1972, the court ordered that certain of these customers be stricken from the distribution schedules pending an investigation of their claims. Securities and Exchange Commission v. JNT Investors, Inc., Civil No. 72–681 (S.D.N.Y. June 9, 1972). In order to resolve the claims of these customers and certain other problem claims, the trustee was authorized by the court, pursuant to 11 U.S.C. § 567(2), to examine the directors and officers of JNT and other specified individuals concerning "the acts, conduct, property, liabilities and financial condition of the Debtor [JNT], the operation of the business of the Debtor and any other matter relevant to this proceeding." Securities and Exchange Commission v. JNT Investors, Inc., Civil No. 72–681 (S.D.N.Y. Nov. 29, 1972). Included among the people whom the trustee was authorized to examine were defendants Harlan J. Sauer, Jay N. Tabatchnick, Martin D. Weiss, as well as the plaintiffs and other customers of Weiss. Pursuant to the court order, Salomon personally examined Sauer, the plaintiffs and certain other customers of Weiss. Salomon admits that most of the information in his complaint was obtained in his interview with plaintiffs and also that he told plaintiffs that he was planning to establish his own law office in April, 1973. Sauer claims that Salomon, while deposing him, asked him numerous questions concerning his relationship with Weiss and concerning customers introduced to JNT by Weiss. This is not denied by Salomon.

In arguing that this court should disqualify plaintiffs' law firm, defendants Weiss and Sauer have addressed their arguments to the Code of Professional Responsibility;[4] specifically to Canon 9 ("A Lawyer Should Avoid Even the Appearance of Professional Impropriety."), Canon 5 ("A Lawyer Should Ex-

---

specifically identifiable. 15 U.S.C. § 78fff(c)(2)(B).

3. SIPC is subrogated to the claims of customers to the extent that it has advanced money to the trustee to meet the claims of customers. 15 U.S.C. § 78fff(f)(1).

4. ABA Code of Professional Responsibility. Adopted by N.Y.State Bar Ass'n eff. Jan. 1, 1970 and reprinted in N.Y. Judiciary Law App. at 77–120 (McKinney's Consol.Laws, c. 30, Supp. 1973–74). Although this Code has not been specifically adopted by the Southern District, courts have traditionally looked to the ABA Canons in interpreting the ethical obligations of attorneys. Emle Industries Inc. v. Patentex Inc., 478 F.2d 562 (2d Cir. 1973); City of New York v. General Motors Corp., 60 F.R.D. 393, Civil No. 72–4213 (S.D.N.Y. August 9, 1973); Estate Theatres Inc. v. Columbia Pictures Industries, Inc., 345 F.Supp. 93, 95 n. 1 (S.D.N.Y.1972); E. F. Hutton & Co. v. Brown, 305 F.Supp. 371, 377 n. 7 (S.D.Tex.1969). See also General Rules of United States District Court for the Southern District of New York, Rules 3(a) and 5(f).

ercise Independent Professional Judgment on Behalf of a Client"), and, by implication, to Canon 4 ("A Lawyer Should Preserve the Confidences and Secrets of a Client"). Canons 4 and 5 are not directly applicable to the facts of this case since none of the defendants was ever a client of Salomon. Salomon was appointed by SIPC to assist Harvey Miller, the attorney for the trustee, and his client therefore was either the trustee, Jerry Klein, or SIPC itself. Under 15 U.S.C. § 78eee(b)(3), the person selected as trustee for the liquidation of the debtor must be disinterested, which means that he cannot be an attorney for the debtor or have any interest materially adverse to that of the creditors or stockholders of the debtor (11 U.S.C. § 558). There can thus be no justifiable claim that Salomon had an attorney-client relationship with any defendant. Furthermore, Salomon has stated that he notified both Miller and Klein of his intention to bring this suit and that they had no objections (Salomon affidavit ¶ 12). Even if it were accepted that Salomon owed a certain loyalty to JNT, this loyalty does not necessarily extend to its officers or directors. See Ethical Consideration 5–18, ABA Code of Professional Responsibility, N.Y. Judiciary Law App. at 100–101.[5]

The activities of Salomon also do not literally come within the prohibitions traditionally associated with Canon 9 and the pertinent Ethical Consideration and Disciplinary Rule.[6] Ethical Consideration 9–3 provides that:

"After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists."

Disciplinary Rule 9–101(B) states that:

"A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee."

Plaintiffs' attorneys have argued that they should not be disqualified under these provisions since Salomon was not a public employee. As assistant to the attorney for the trustee, Salomon certainly held a position different from that of attorneys who have in the past been disqualified under Canon 9. An examination of the cases interpreting that Canon reveals that while the issue of who is a public employee has rarely been litigated, the attorneys who have been disqualified have usually been government

---

5. ABA Code of Professional Responsibility —Ethical Considerations:

"EC–5–18 A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present."

6. The functions of the Canons, the Ethical Considerations and the Disciplinary Rules are discussed in the Preliminary Statement of the Code which states that:

"The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession. They embody the general concepts from which the Ethical Considerations and the Disciplinary Rules are derived.

"The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations.

"The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. . . . An enforcing agency, in applying the Disciplinary Rules, may find interpretive guidance in the basic principles embodied in the Canons and in the objectives reflected in the Ethical Considerations."

prosecutors.[7] Salomon was not a prosecutor, and arguably, did not work for the government. It is not necessary, however, for this court to decide precisely whether or not Salomon was a "public employee".

■ As has been noted heretofore (note 4), the Southern District has not specifically adopted the Code of Professional Responsibility, and the courts have looked to the Code primarily as an aid in its determination of acceptable practices. The power of this court to disqualify lawyers is based on the court's general supervisory powers,[8] and questionable behavior will not be permitted merely because it is not directly covered by the Canons. Even though Salomon may not technically have been a public employee, his disqualification is required for many of the same considerations which necessitated the ABA's adoption of Canon 9.

The attorney for SIPC is in many ways a representative of governmental interests. SIPA was enacted in response to the financial crisis of 1969–70 which had led to the failure of several brokerage firms and resulted in customers losses in excess of $130 million.[9] As part of its efforts to protect the public investor, Congress created SIPC, a non-profit corporation whose membership consists of registered brokers[10] and dealers, and members of the national securities exchange. SIPC administers an insurance program designed to protect the customers of its members. SIPC is not a federal agency and cannot regulate its members; it is, however, responsible for helping to develop procedures designed to detect the approaching financial difficulties of its members (15 U.S. C. § 78iii(e)(1)), and it has made a practice of securing detailed financial reports on certain aspects of debtors' businesses. 73 Colum.L.Rev., *supra*, note 9 at 820. The Board of Directors is appointed by the Government: one by the Secretary of the Treasury; one by the Federal Reserve Board; and five by the President with the advice and consent of the Senate. 15 U.S.C. § 78ccc(c)(2). Salomon was an assistant to the attorney specified by SIPC and appointed by the court (15 U.S.C. § 78eee(b)(3)). As such, he was in effect the representative of SIPC and was entitled to be regarded as such.

Salomon's representation of the SIPC trustee, followed shortly thereafter by his representation of plaintiffs, customers of JNT, has created, at the very least, the appearance of impropriety. Salomon was assisting the trustee in winding up the business affairs of JNT and deciding what claims of customers should be allowed. This position gave him a real advantage in learning of any illicit activities in which defendants may have been engaged. He learned from the SEC that there were questions concerning the activities of Weiss, and it became part of his job to investigate these questions. It seems probable that in his investigations Salomon was able to obtain information that he would have been unable to secure if he had been interviewing in a private capacity. See Allied Realty of St. Paul v. Exchange National Bank of Chicago, 283

7. See e. g. In Control Data Corporation v. International Business Machines Corporation, 318 F.Supp. 145 (D.Minn.1970); Allied Realty of St. Paul Inc. v. Exchange National Bank, 408 F.2d 1099 (8th Cir.), cert. denied, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73 (1969); Hilo Metals Company v. Learner Company, 258 F.Supp. 23 (D.Hawaii 1966). See also, A.B.A. Opinion 134 (1935), and A.B.A. Opinion 39 (1931).

8. See cases cited in note 4, *supra*; see also, Richardson v. Hamilton International Corporation, 469 F.2d 1382, 1385 (3d Cir. 1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973).

9. SEC Exchange Act Release No. 9622 (May 31, 1972). See, generally, Note, The Securities Investor Protection Act of 1970: An Early Assessment, 73 Colum.L.Rev. 802 (1973).

10. Certain brokers are excluded under 15 U.S.C. § 78ccc(a)(2).

F.Supp. 464 (D.Minn.1968), aff'd., 408 F.2d 1099 (8th Cir.), cert. denied, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73 (1969); see also ABA Opinion #135 (March 15, 1935).

Salomon has maintained that the information he obtained in his capacity as assistant is currently available to the public and that the defendants, therefore, have not been prejudiced. This is not, however, the case. At the request of the SEC, the depositions taken by Salomon are presently in the custody of this court and, for the time being, are not available for public inspection. Even if the information upon which plaintiffs' suit is based were freely available, however, this would not prevent the disqualification of Salomon if his behavior presented the appearance of impropriety. (See, generally, Doe v. A. Corp., 330 F.Supp. 1352, 1355 (S.D.N.Y. 1971), aff'd per curiam, 453 F.2d 1375 (2d Cir. 1972); Fleischer v. A. A. P. Inc., 163 F.Supp. 548 (S.D.N.Y.1958), appeal dismissed sub nom., Fleischer v. Phillips, 264 F.2d 515 (2d Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959)). An individual in Salomon's position could have decided that he would use his position to develop a suit which he would later bring after he had severed his connections with SIPC. Many undesirable consequences could result from such a situation. Salomon could have neglected the proper focus of his own investigations because he was attempting to develop support for his own prospective suit.[11] By pursuing such a course, Salomon would get paid twice for his investigation, once by his former and once by his present employer. See *Allied Realty*, 408 F.2d at 1102, *supra*.

If any of these possibilities were permitted, the effectiveness of SIPA would be impaired. Not only would attorneys be tempted to subordinate their official duties to their private goals, but confidence in the integrity of the attorneys selected by SIPC would be destroyed. Many directors and officers of debtor companies would be less cooperative in helping the trustee to liquidate the business of the debtor, and customers might feel compelled to offer information adverse to principals, whether relevant or not, in order to have their claims allowed.

Finally, there is a danger that if men in the position of Salomon are permitted to bring suit, the public confidence in the integrity of the judicial process would be undermined. As Chief Judge Kaufman, writing for the court in Emle Industries Inc. v. Patentex Inc., *supra*, 478 F.2d at 575, has pointed out: "[t]he stature of the profession and the courts, and the esteem in which they are held, are dependent upon the complete absence of even a semblance of improper conduct."

The disqualification of Salomon must logically extend to include the members of his law firm as well. There is no reason to suppose that Salomon has not communicated his views of this case to his partners, and his knowledge must therefore be imputed to them. (Consolidated Theatres v. Warner Bros. Circuit Management Corporation, 216 F.2d 920 (2d Cir. 1954); United States v. Standard Oil Company, 136 F.Supp. 345, 362 (S.D.N.Y.1955)).

It is ordered, therefore, that the law firm of Rosen, Wise, Felzen & Salomon be disqualified from representing the plaintiffs in the instant case and from having any connection with this litigation or any similar suits of customers of JNT.

---

11. A reading of the depositions taken by Salomon shows a definite intent on his part to develop a case against defendants. These depositions, however, cannot be discussed in detail since the SEC has requested that they be kept confidential in order not to interfere with their pending investigations.