**U.S. INDUSTRIES, INC., Plaintiff,**

v.

**Myron GOLDMAN and Solomon Goldman, Defendants.**

**No. 76 Civ. 1108.**

United States District Court,
S. D. New York.

July 6, 1976.

8

Patterson, Belknap & Webb, New York City by D. Robert Owen and Karl E. Seib, Jr., New York City, for plaintiff.

Kantor, Shaw & Davidoff, P.C., New York City, for defendants; Donald H. Shaw, New York City, of counsel.

1. Myron Goldman and his father, co-defendant Solomon Goldman, formerly owned Excelled Sheepskin and Leather Coat Co., Inc. and two other companies. All three companies were

MEMORANDUM

BONSAL, District Judge.

Defendants move by order to show cause for an order disqualifying Patterson, Belknap & Webb, Esqs. ("PB&W") from acting as attorneys for plaintiff United States Industries, Inc. ("USI") and from advising or counseling plaintiff USI with respect to this action; enjoining PB&W from otherwise engaging in litigation arising out of the same facts upon which this action is based or making any disclosures regarding the facts of this case; sealing the record herein; and dismissing the action with prejudice against plaintiff, on the ground that there is a conflict of interest since PB&W was allegedly "general counsel" to USI during the period when defendant Myron Goldman ("Goldman") was a director of USI and president of various companies which are divisions of USI, and during which period the complaint alleges that Goldman caused one division, Excelled Leather Coat Co. ("Excelled"),[1] to make false financial reports to USI.

USI acquired Excelled from defendants on January 30, 1970 in exchange for USI common stock and Excelled became one of approximately 100 divisions of USI. The agreement of acquisition between defendants and USI provided *inter alia* that as part of the consideration for the Excelled stock, USI would deliver to defendants on or before May 31, 1975 shares of USI common stock as a "Final Contingency Payment" if Excelled exceeded certain pre-tax profit levels in the years 1969 through 1974. On or about May 31, 1975, allegedly in reliance on the financial reports of Excelled for the years 1969 through 1974 submitted by defendants to USI showing an aggregate pre-tax profit of $9,072,908, USI delivered to defendant 263,023 shares of USI common stock having a total market value of $1,000,000.

From January 30, 1970, the date of the USI acquisition, until December, 1975, Gold-

acquired by USI on January 30, 1970 and collectively became Excelled Leather Coat Co., a division of USI ("Excelled").

man was employed by USI as chief executive officer in charge of Excelled. From December 20, 1973 until June 11, 1975, Goldman was a director of USI.

*The Complaint.* Plaintiff USI alleges in the complaint that the Excelled financial reports for "1974 and prior years" contained untrue statements of material facts which overstated Excelled's pre-tax profits by more than $3.6 million, and that therefore defendants were not entitled to the Final Contingency Payment of May 31, 1975. USI seeks return of the 263,023 shares of its common stock or restitution, damages in the sum of $2,737,976, and punitive damages of $5-million for Goldman's breach of fiduciary duty and for fraud.[2]

*Defendants' Motion and Contentions.* Defendants move for disqualification of PB&W as counsel for plaintiff USI, contending that a corporation's attorneys owe a "dual obligation" to the directors as well as to the corporation; that there is a confidential and fiduciary relationship between a corporation's attorneys and the corporation's directors; that there is a likelihood that PB&W obtained knowledge and information with respect to the issues involved in this action during the period when Goldman was a director of USI; that investors in a publicly held corporation have an interest in having independent counsel pursue the action for the corporation; and that the "appearance of impropriety" should be avoided.

At the Court's direction, the deposition of Goldman was taken on May 26, 1976. In addition, the parties deposed several attorneys at PB&W who allegedly worked on USI matters, and deposed two "in-house" attorneys for USI. Several affidavits from additional attorneys were also submitted for consideration.[3]

Goldman testified that PB&W attorneys were "involved" in drafting or reviewing contracts in 1971 and 1972 among Excelled and other companies to import leather goods manufactured in Poland and Hungary made from leather originating in Lebanon or Argentina; that transactions arising from these contracts are the basis for certain of USI's allegations in the complaint;[4] that PB&W was involved in USI's acquisition of Excelled in 1970; and that PB&W attorneys attended four USI Board of Directors meetings while Goldman was director. However, Goldman testified that he personally had only one meeting with any attorney from PB&W (which took place in 1970); that he did not correspond with PB&W, but rather followed USI "general business procedure" of dealing with USI's

2. By stipulation of the parties, defendants' time to answer or move under Fed.R.Civ.P. 12 was extended. No answer has yet been filed.

3. In addition to Goldman's deposition, the following attorneys were deposed: Robert Landes, former assistant general counsel of USI and vice president general counsel of the USI "Apparel Group", a group of USI companies; George MacLean, former general counsel of the USI "Apparel Group"; Richard G. Moser, partner at PB&W in charge of services rendered to USI; Robert D. Sack, of PB&W; Stephen W. Schwarz, of PB&W; and Karl E. Seib, Jr., of PB&W. Affidavits of Sanford Kaynor, general counsel to USI and Yale D. Tauber, of PB&W, were also submitted by the parties.

4. Defendants contend that PB&W attorneys provided legal services as to matters related to the following allegations in the complaint:

"18. . . . [T]he following items . . were erroneously or falsely recorded on or omitted from the financial records of Excelled for 1974 and prior years:

\*     \*     \*     \*     \*     \*

"(e) Amounts advanced to an agent for manufacture of coats in Poland were recorded as inventory although such inventory did not exist. This concealed the true cost of goods sold—$490,837.

\*     \*     \*     \*     \*     \*

"(o) A substantial purchase of boot liners from Argentina, in a style and sizes unrelated to usage, was in large part worthless and was not charged off—$1,337,976."

Defendants also contend that PB&W was involved in the transaction referred to in paragraph 26 of the complaint, which alleges that a division of USI under Goldman's authority ("Georgia Boot") purchased $2,143,000 of useless boot liners from a company which was unable to repay a debt due in 1974 and guaranteed by Excelled, and that said purchase was made in order to provide said company with the funds to repay that debt. This claim appears to be related to ¶ 18(o), *supra*.

in-house counsel on legal matters; and that he had no authority to retain counsel for Excelled. Goldman further testified that his knowledge of PB&W's "involvement" in the drafting of Excelled's contracts was based upon discussions with USI in-house counsel and that it was his "opinion that [PB&W] would be involved as they had been in the past with these very sophisticated transactions", but that he could not recall which contracts PB&W attorneys actually worked on.

Defendants do not contend that PB&W ever represented Goldman personally or that any "specific disclosures with respect to any of the facts of this case . . . have been made by Myron Goldman to any member of [PB&W]." Def.'s Br. at 5. Defendants do not present any examples of any other possible confidential disclosures made to PB&W in the course of performance of the latter's services to Excelled.

*Relationship Between USI or Excelled and PB&W.* The depositions and affidavits of several PB&W attorneys and USI in-house attorneys reveal that PB&W was "general counsel" to USI until 1967 when Sanford Kaynor was given the title of general counsel, and an in-house counsel staff, and PB&W became "special counsel". Thereafter, assignments to outside counsel, including PB&W, were made by Kaynor or one of his staff and were made when the in-house counsel staff was overburdened or the matter required special expertise. Since 1967, PB&W has had access to USI files, books and records only upon request and upon a "need-to-know" basis. Since 1967, USI and its divisions have utilized the services of at least eight other law firms in New York City for various purposes.

These depositions and affidavits further indicate as to matters related to this litigation that in 1970 the PB&W attorneys assisted the in-house counsel in drafting a

contract between Excelled and other companies for the importation of leather goods manufactured in Hungary from leather originating in Lebanon; that in 1970 and 1972, PB&W attorneys assisted in drafting a security agreement and financing statement and did other legal research in connection with said contract; and that in 1972 PB&W attorneys spent several hours assisting Excelled in dealings through the Argentinian consul. It appears that in each instance, the PB&W attorneys submitted their drafts to the in-house attorney who had requested them and had no further contact with USI or Excelled on the matters. In 1970 and in 1975, PB&W attorneys worked on the computation of the Final Contingency Payment. The depositions indicate that the only PB&W attorney who attended USI Board of Directors meetings while Goldman was a director was Richard G. Moser, Esq. Mr. Moser stated that he attended four such meetings and did so at the request of USI's general counsel, but he did not participate in discussions of matters pertaining to Excelled.

According to PB&W time records, no services were rendered to USI on Excelled matters by PB&W from March, 1974 to June 11, 1975. It would appear from the depositions that the total time spent by PB&W between January 30, 1970 and June 11, 1975 was 160 hours, and of these, only 65 were spent on matters which defendants contend were related to this litigation.

## DISCUSSION

Defendants rely on the American Bar Association's Code of Professional Responsibility ("Code"), Canon 4 ("A Lawyer Should Preserve the Confidences and Secrets of a Client"),[5] Canon 5 ("A Lawyer Should Exercise Independent Judgment on Behalf of a Client"),[6] and Canon 9 ("A Lawyer Should

---

**5.** *See, e. g.,* Code, E–C 4–5:

"A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes. . . Care should be exercised by a lawyer to pre-

vent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that might require such disclosure." (Footnote omitted.)

**6.** *See, e. g.,* Code, E–C 5–14:

"Maintaining the independence of professional judgment required of a lawyer precludes

Avoid Even the Appearance of Professional Impropriety").[7] *See* N.Y. Jud. Law (McKinney 1975), at 351 *et seq.*[8]

■ Canons 4 and 5 are not applicable in this case since Goldman was never a "client" of PB&W. *Handelman v. Weiss,* 368 F.Supp. 258, 262 (S.D.N.Y.1973). *Cf. International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1292 (2d Cir.1975). PB&W were attorneys for USI; no services were performed for Goldman personally and he never paid them any fees. Goldman's position as an officer of Excelled and director of USI (thus an agent for these companies) does not create an attorney-client relationship between him and PB&W. *Meehan v. Hopps,* 144 Cal.App.2d 284, 301 P.2d 10 (1956). *See* Code, Ethical Consideration ("E–C") 5–18 ("lawyer . . . retained by a corporation . . . owes his allegiance to the entity and not to a . . . director [or] officer . . ."). Indeed, Goldman stated that he only met with a PB&W attorney on one occasion, in 1970, that he did not correspond with PB&W, and that he had no authority to retain counsel for Excelled.

■ Even if Canon 4 applied, defendants, relying primarily upon Goldman's deposition which consists of unsupported and conclusory assertions as to PB&W's "involvement" with Excelled's business, do not satisfy the burden of showing that there is a "substantial relationship . . . between the subject matter of [the] former

representation and that of a subsequent adverse representation." *See T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265, 268 (S.D.N.Y.1953) (Weinfeld, J.). *Compare Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir.1973). *Cf. Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 756–57 (2d Cir.1975).

In addition, there would appear no contravention of Canon 5, even if it applied here. PB&W was retained as special counsel to USI and only performed services for Excelled as a division of USI upon request of USI in-house counsel. Certainly, in bringing this action on behalf of USI, PB&W is not diminishing its loyalty to its client, USI. *See* Code, E–C 5–14, 5–18. Nor has there been a showing that any attorney from PB&W necessarily will be a witness at trial. *Cf.* Code, E–C 5–9, 5–10.

Defendants' contention that PB&W's representation of USI herein conveys the "appearance of impropriety," and thus contravenes Canon 9, is rejected. As stated above, PB&W has provided legal services to USI and its divisions only when so requested by USI in-house counsel, and no services were rendered to Goldman personally. Therefore PB&W owed its duty of loyalty and confidentiality to USI and not to Goldman. In any event, there are no factual allegations that PB&W has obtained or will utilize information obtained in confidence from defendants. *See Silver Chrysler*

---

his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant." (Footnote omitted.)

7. *See, e. g.,* Code, E–C 9–2:
"Public confidence in law and lawyers may be eroded by irresponsible or improper conduct of a lawyer. On occasion, ethical conduct of a lawyer may appear to laymen to be unethical. In order to avoid misunderstandings and hence to maintain confidence, a lawyer should fully and promptly inform his client of material developments in the matters being handled for the client. While a

lawyer should guard against otherwise proper conduct that has a tendency to diminish public confidence in the legal system or in the legal profession, his duty to clients or to the public should never be subordinate merely because the full discharge of his obligation may be misunderstood or may tend to subject him or the legal profession to criticism. . . ."

8. The district court bears responsibility for supervision of the bar (*Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975)), and although the Southern District has not specifically adopted the Code, the courts look to it "primarily as an aid in its determination of acceptable practices." *Handelman v. Weiss,* 368 F.Supp. 258, 263 (S.D.N.Y.1973).

**12**

Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d at 756–57. Finally, PB&W's "involvement" with Excelled was de minimus; during the 4½-year period relevant to the complaint, PB&W attorneys devoted only 65 hours in performance of their services on matters even allegedly related to the matters here involved, and no services were rendered between March, 1974 and June 11, 1975, the bulk of the period that Goldman was a director of USI. Canon 9 "should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules. International Electronics Corp. v. Flanzer, 527 F.2d at 1295.

While it is of "paramount importance . . . '[to maintain] the highest standards of professional conduct and the scrupulous administration of justice'" (Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d at 757), there is also the significant countervailing consideration of "the individual's right to be represented by counsel of his or her choice" (Hull v. Celanese Corp., 513 F.2d 568, 569 (2d Cir.1975).

Accordingly, defendants' motion is denied.

It is so ordered.