**Joan FLEGO, Plaintiff,**

v.

**PHILIPS, APPEL & WALDEN, INC. Richard Henrickson and Merrill Lynch Pierce Fenner & Smith, Inc., Defendants.**

**Civ.A. No. 80–4090.**

United States District Court, D. New Jersey.

May 21, 1981.

William A. Despo, Red Bank, N. J., for plaintiff.

Bernard Bressler, Bressler, Lipsitz & Rothenberg, New York City, Sills, Beck, Cummis, Radin & Tischman, Newark, N. J., for defendants, Philips, Appel & Walden and Henrickson.

## OPINION

WHIPPLE, Senior District Judge.

This matter is before the Court on defendant Philip Appel & Walden, Inc.'s motion to disqualify plaintiff Joan Flego's attorney, William A. Despo, Esq. In the underlying action, plaintiff alleges that defendants, various broker-dealers registered with the Securities and Exchange Commission, violated section 17(a) of the Securities Act of 1933, and sections 10(b) and 15(c) of the Securities Act of 1934, by engaging in, among other things, unauthorized trading and churning of her stock accounts. Plaintiff also asserts common law claims for fraud, breach of fiduciary duty, and conversion. Plaintiff has retained as her attorney William A. Despo, a former compliance attorney with the American Stock Exchange (hereinafter referred to as "AMEX"). In that capacity, Mr. Despo investigated various practices of the Wayne, New Jersey office of defendant Philips, Appel, & Walden, Inc. (hereinafter referred to as "PAW-Wayne"). Consequently, PAW-Wayne now moves this Court to disqualify Mr. Despo on the ground that his representation violates Disciplinary Rule 9–101(B) of the Code of Professional Responsibility. This Court has reviewed all of the moving papers, affidavits, and oral argument. For the reasons which follow, defendant PAW-Wayne's motion is denied.

In order to fully consider defendant's motion to disqualify plaintiff's attorney, it is necessary to understand the background of this proceeding. Mr. Despo was employed as a compliance attorney at the AMEX from approximately December 7, 1978 until April 30, 1980, at which time he entered private practice and established his own law firm. Early in 1979, Mr. Despo was assigned by his supervisor to investigate certain customer complaints relating to PAW-Wayne. These complaints had been uncovered through an inspection by AMEX's Options Inspection Department. Specifically, Despo was directed to determine whether PAW-Wayne had violated any AMEX rules. Due to the minor character of these complaints, Despo recommended that they not be investigated; however, he was directed to combine these complaints with another customer complaint being processed by the Options Inspection Department. In that complaint, a customer of PAW-Wayne alleged that PAW-Wayne, its office manager, Ramon McLeod, and one of its account executives, Samuel Confalone, had engaged in churning and unauthorized and unsuitable trading of his options accounts, and was suing for one million dollars.

By affidavit, Mr. Despo states that his investigation of PAW-Wayne at that time focused on a review of the latter lawsuit, a general review of the remaining customer complaints, and a general review of branch office supervision of options accounts. He formally interviewed Mr. Confalone, Mr. McLeod, and Mr. Kowitski, a second account executive. Partial transcripts of these interviews have been submitted to the Court.

Subsequent to this investigation, Mr. Despo entered private practice, and in October, 1980, undertook the representation of Ms. Flego in the instant matter against PAW-Wayne and others.

In analyzing this motion for disqualification, this Court turns for guidance to the Code of Professional Responsibility and the Canons and Disciplinary Rules therein.[1] At

---

1. The functions of the Canons, the Ethical Considerations and the Disciplinary Rules are dis-cussed in the Preliminary Statement of the Code which states that:

the same time, this Court is cognizant of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel. *Woods v. Covington County Bank,* 537 F.2d 804, 810 (5th Cir. 1976); *General Motors Corporation v. City of New York,* 501 F.2d 639, 649 (2d Cir. 1974).

Canon 9 of the Code of Professional Responsibility provides that: "A lawyer should avoid even the appearance of professional impropriety." In this regard, Disciplinary Rule 9–101(B) admonishes that: "A lawyer should not accept private employment in a matter in which he had substantial responsibility while he was a public employee." The purpose underlying this interdiction, as indicated by the ABA Comm. on Professional Ethics, Opinions, No. 37 (1931) is: [2]

[To avoid] the manifest possibility that his action as a public legal official might be influenced (or be open to the charge that it had been influenced) by the hope of later being employed privately either to uphold or to upset what he had done.

*Id.,* reprinted in ABA Opinions on Professional Ethics 280, 282 (1967); *see also General Motors Corp. v. City of New York, supra* at 649. More recently, the ABA

"The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession. They embody the general concepts from which the Ethical Considerations and the Disciplinary Rules are derived.

The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations.

The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action .... An enforcing agency, in applying the Disciplinary Rules, may find interpretive guidance in the basic principles embodied in the Canons and in the objectives reflected in the Ethical Considerations."

Committee on Professional Ethics, in Formal Opinion No. 342 (1976), articulated the policy considerations of DR 9–101(B) as follows: the treachery of switching sides; the safeguarding of confidential governmental information from future use against the Government; the need to discourage government lawyers from handling particular assignments in such a way as to encourage their own future employment in regard to those particular matters after leaving government service; and the professional benefit derived from avoiding the appearance of evil.[3] *Id.,* reprinted in M. Schwartz, Lawyers and the Legal Profession, at 360–61 (1979).

It is undisputed that Despo's representation of plaintiff in this action is private employment. As used in DR9–101(B), "private employment" merely refers to employment as a private practitioner. ABA Comm. on Professional Ethics, Opinion No. 342 (1976).

The parties sharply contest, however, whether Despo's tenure at AMEX qualified him as a "public employee", and further, whether the instant case is a "matter" in which Despo had substantial responsibility within the meaning of DR9–101(B).

In determining who qualifies as a public employee, courts generally have relied more

2. Opinion 37 was a commentary principally on Canon 36 of the Canons of Professional Ethics. The Canons of Professional Ethics were superseded by the Code of Professional Responsibility on January 1, 1970. Canon 9 and DR9–101(B), with which we deal, however, carry forward the ethical principles embodied in old Canon 36. *See* R. Wise, Legal Ethics 122 n.2 (1970).

3. Canon 9 and DR9–101(B) apply regardless of which "side" a former public attorney represents upon entering private practice. Indeed, the problem of side-switching and the conflicts of interest and breaches of confidentiality which are almost certain to arise when counsel switches sides, are addressed by Canon 4 and not Canon 9. In this regard the Court notes that the AMEX is not a party to the instant litigation and has taken no position regarding Mr. Despo's representation of plaintiff, Ms. Flego.

on policy considerations than on formalistic definitions. Annotated Code of Professional Responsibility, at 428 (1979). For example, in *Handelman v. Weiss*, 368 F.Supp. 258, 262–64 (S.D.N.Y.1973), the court held that a former attorney for the Securities Investor Protection Corporation (SIPC) was a public employee for the purposes of DR9–101(B). The court recognized that SIPC, a nonprofit organization which administers an insurance program to protect the customers of its members, registered broker-dealers and members of the national securities exchanges, was not strictly a federal agency and could not regulate its members. Nevertheless, the SIPC had been created by Congress and its Board of Directors was appointed by the federal government; therefore, an SIPC attorney should be considered a representative of government interests. In this regard, the court also pointed out that a SIPC attorney might obtain information which he or she would be unable to secure in a private capacity. *See also, Woods v. Covington County Bank*, 537 F.2d 804 (5th Cir. 1976) (holding that a former reserve officer of the Navy's Judge Advocate General Corps was not a public employee for the purposes of DR9–101(B) because his primary duties had been to represent private individuals, not the government.)

Policy considerations underlying the AMEX indicate that its attorneys should be deemed public employees for the purpose of DR9–101(B). AMEX ostensibly is an independent, self-regulatory body; however, by definition, a national securities exchange is a compliance arm of the Securities and Exchange Commission. Section 6(b) of the Securities Exchange Act of 1934 (The "Act"), 15 U.S.C. § 78f(b)(1), provides: ·

(b) Prerequisites to registration. An exchange shall not be registered as a national securities exchange unless the Commission determines that—

(1) Such exchange is so organized and has the capacity to be able to carry out the purposes of this title [15 USCS §§ 78a et seq.] and to comply, and (subject to any rule or order of the Commission pursuant to section 17(d)

or 19(g)(2) of this title [15 USCS § 78q(d) or § 78s(g)(2)]) to enforce compliance by its members and persons associated with its members, with the provisions of this title [15 USCS §§ 78a et seq.], the rules and regulations thereunder, and the rules of the exchange.

This symbiotic interaction between the SEC and the national exchanges is fully described in the legislative history of the Securities Acts Amendments of 1975. S.Rep. 94–75, 94th Cong. 1st Sess. 23036, reprinted in (1975) U.S.Code Cong. & Ad. News 179 *et seq.* The Senate report remarked that in enacting the Exchange Act of 1934, Congress established a "unique pattern of regulation combining both industry and government responsibility:"

The SEC has the authority and responsibility to assure compliance by all broker-dealers with the legal requirements of the Exchange Act and of the rules which the SEC is authorized to promulgate under the Exchange Act.

Industry organizations, *i. e.*, the exchanges and the NASD, are delegated governmental power in order to enforce, at their own initiative, compliance by members of the industry with both the legal requirements laid down in the Exchange Act and ethical standards going beyond those requirements.

The SEC is charged with supervising the exercise of this self-regulatory power in order to assure that it is used effectively to fulfill the responsibilities assigned to the self-regulatory agencies, and that it is not used in a manner inimical to the public interest or unfair to private interests.

S.Rep. at 23, (1975) U.S.Code Cong. & Ad. News at 201.

The Senate Report further recognized that the exchanges, in fulfilling their "partnership" roles with the SEC, exercise government power in basically three ways which may adversely affect the interests of particular persons:

(1) by imposing a disciplinary sanction, broadly defined, on a member or person affiliated with a member,

(2) by denying membership to an applicant, and

(3) by requiring members to cease doing business entirely or in specified ways with a particular non-member or with respect to a particular security.

S.Rep. at 24, (1975) U.S.Code Cong. & Ad. News at 202–03.

The Senate Committee on Banking, Housing and Urban Affairs explained:

The self-regulatory organizations must exercise governmental-type powers if they are to carry out their responsibilities under the Exchange Act. When a member violates the Act or a self-regulatory organization's rules, the organization must be in a position to impose appropriate penalties or to revoke relevant privileges. Similarly, a self-regulatory organization must be able to prevent an unqualified person from obtaining access to facilities and business opportunities by denying membership. And members' transactions and relationships with non-members must be regulated . . . in order that contact with an unreliable non-member (does not) injure the member or the member's customer on whose behalf the contract is made and [thus] ultimately imperil the future status of the [self-regulatory organization] by sapping public confidence. (quotations omitted.)

S.Rep. at 24, (1975) U.S.Code Cong. & Ad. News at 203.

In fact, the Senate commented that in view of their governmental activities, the exchanges must be governed by the standards of due process:

Recognizing that the self-regulatory organizations utilize governmental-type powers in carrying out their responsibilities under the Exchange Act highlights the fact that these organizations must be required to conform their activities to fundamental standards of due process.

S.Rep. at 25, (1975) U.S.Code Cong. & Ad. News at 203.

In conformity with this Congressional characterization of the national securities exchanges as quasi-governmental bodies, one court has held that by virtue of Section 6(b) of the Exchange Act, the New York Stock Exchange may be considered an agent or arm of the SEC when it brings disciplinary proceedings against brokerage firm employees. *Trama v. The New York Stock Exchange*, (1979 Transfer Binder) Federal Securities Law Reporter (CCH) ¶ 96,748 (S.D.N.Y.1978). Consequently, the court found that the NYSE and its employees were entitled to qualified immunity in an action alleging constitutional violations brought against them as a result of such disciplinary proceedings. *Id.* at p. 94,919.

█ As an AMEX compliance attorney, Mr. Despo was charged with, among other things, investigating alleged violations of AMEX rules and federal securities laws. His duties constituted an integral part of self-regulation which AMEX assumes in its "partnership" with the SEC. Accordingly, this Court concludes that Mr. Despo's tenure as an AMEX compliance attorney qualifies him as a public employee within the meaning of DR9–101(B).

Nevertheless, it is less clear that the instant litigation constitutes a "matter" regarding which Mr. Despo had "substantial responsibility" while in the public employ.

The Code of Professional Responsibility does not provide a test by which a former public attorney can determine whether his or her subsequent private employment involves the same "matter" as that for which he or she had substantial responsibility as a public employee. Eschewing any formalized definition, the ABA Committee on Professional Ethics, in Opinion No. 342 (1976), interpreted the term "matter" as used in the disciplinary rule as follows:

[T]he term seems to contemplate a discrete and isolatable transaction or set of transactions between identifiable parties. Perhaps the scope of the term "matter" may be indicated best by examples. The same lawsuit or litigation is the same matter.

*Id.*, reprinted in M. Schwartz, Lawyers and the Legal Profession at 361 (1979).

Similarly, the Court of Appeals for the Second Circuit has formulated a "same facts" test, focusing on the similarity of facts involved in the former public and current private representations. In *General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974), for example, the court disqualified a former Justice Department antitrust attorney who had prepared a complaint against General Motors Corp. in that capacity from representing New York City in another antitrust case against General Motors Corp. In determining that these two cases involved the same matter, the court looked at the respective pleadings and noted that both complaints alleged monopolization by the same defendant of the same product line in the same geographic market. *Id.* at 651. In fact, virtually every overt act of attempted monopolization alleged in the City's complaint was lifted *in haec verba* from the Justice Department complaint. *Id.*

■ Under neither of these formulations does Mr. Despo's affiliation with the AMEX constitute the same matter as the present litigation. Despo represents Ms. Flego regarding the alleged mishandling of her stock accounts by, among others, PAW-Wayne and one of its account executives, Mr. Henrickson. In contrast, in his prior employment, Despo acted as an agent of the AMEX in its investigations of specific complaints regarding PAW-Wayne's handling of specific options accounts unrelated to Ms. Flego's accounts. During this investigation, Mr. Despo interviewed two account executives but had no communication with Mr. Henrickson, Ms. Flego's broker. True, Despo also interviewed PAW-Wayne's office manager, Mr. McLeod, regarding general supervision of accounts of all types; however, the degree of supervision of Ms. Flego's accounts was never addressed. In any event, the full transcripts of all the interviews conducted by Despo at PAW-Wayne are available to defendants. Thus, it is unlikely that any trial would be tainted by the prior knowledge Despo may have gained by virtue of these interviews.

■ Absent any substantial similarity of facts between Despo's former and current representations, this Court refuses to disqualify Mr. Despo for possible appearance of impropriety. As the Second Circuit reiterated in *Armstrong v. McAlpin*, 625 F.2d 433, 445 (2d Cir. 1980) (en banc), "[T]he possible 'appearance of impropriety is simply too slender a reed on which to rest a disqualification order . . . particularly . . . where . . . the appearance of impropriety is not very clear.'" *Id.* at 445, *citing Board of Education v. Nyquist*, 590 F.2d 1241, 1247 (2d Cir. 1979).

Accordingly, defendant PAW-Wayne's motion to disqualify plaintiff's attorney is denied. Counsel for plaintiff will prepare an appropriate order within five (5) days of this Opinion.